Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: rmoest@gmail.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTEN AUGITTO, derivatively on behalf of GRAIL, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT P. RAGUSA, JOSHUA F. OFMAN, HARPAL S. KUMAR, WILLIAM CHASE, SARAH KREVANS, STEVEN MIZELL, and GREGORY SUMME, <br><br> Defendants, <br><br> and <br><br> GRAIL, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br><br> <u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u> |

## INTRODUCTION

Plaintiff Kristen Augitto ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant GRAIL, Inc. ("Grail" or the "Company"),

files this Verified Shareholder Derivative Complaint against defendants Robert P. Ragusa ("Ragusa"), Joshua F. Ofman ("Ofman"), Harpal S. Kumar ("Kumar"), William Chase ("Chase"), Sarah Krevans ("Krevans"), Steven Mizell ("Mizell"), and Gregory Summe ("Summe") (collectively, the "Individual Defendants," and together with Grail, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Grail, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Ragusa, Ofman, and Kumar for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Grail, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from May 13, 2025 through February 19, 2026, both dates inclusive (the "Relevant Period").

2. Grail is a commercial-stage healthcare company that focuses on early cancer detection through screening methodology, with the primary objective of screening individuals for multiple types of cancer with a single test. To achieve this goal, the Company is developing a multi-cancer early detection test, called Galleri, that can screen

for multiple types of cancer by testing blood samples of patients.

3. In 2021, Grail initiated a Galleri study ("NHS-Galleri"), which was a three-year trial with the primary purpose of assessing whether Galleri could reduce late-stage (III and IV) cancers through early cancer detection.

4. During the Relevant Period, the Individual Defendants touted the NHS-Galleri trial's likelihood of success of achieving its primary endpoint of a statistically significant reduction in Stage III and IV cancer, despite having an insufficient trial period length.

5. For example, on May 13, 2025, the Company hosted an earnings call to discuss the Company's first quarter financial results (the "1Q 2025 Earnings Call"). On the 1Q 2025 Earnings Call, Defendant Kumar, addressed the initial top-line results from the first screening in the NHS-Galleri trial by comparing the initial screening results of the NHS-Galleri trial to another Grail study, PATHFINDER, stating that the NHS-Galleri positive predictive value was "substantially higher" than PATHFINDER's results. Defendant Kumar further noted that "***the top line results from the prevalent screening round of the NHS-Galleri trial are very encouraging.***"[1]

6. Additionally, on August 12, 2025, the Company held an earnings call to discuss the Company's financial results for the second quarter of 2025 (the "2Q 2025 Earnings Call"). During the 2Q 2025 Earnings Call, Defendant Kumar provided updates on the NHS-Galleri study by confirming that the "***size of the study was set to be able to deliver a statistically significant result in terms of [late-stage cancer] reduction.***" During the 2Q 2025 Earnings Call, Defendant Kumar also expressed confidence in the anticipated NHS-Galleri results, stating that it is "***a very large study conducted extremely well***," and that the expected results "***should give [the Company] a substantial growth opportunity.***"

7. The truth emerged on February 19, 2026, when the Company issued a press release titled "Landmark NHS-Galleri Trial Demonstrates a Substantial Reduction in Stage

---

[1] All emphasis herein has been added unless otherwise stated.

Verified Shareholder Derivative Complaint

IV Cancer Diagnoses, Increased Stage I and II Detection of Deadly Cancers, and Four-Fold Higher Cancer Detection Rate" (the "February 2026 Press Release"), which revealed that Grail's NHS-Galleri study's "***primary endpoint of statistically significant Stage III-IV reduction was not observed*.**"

8.    Later that day, the Company conducted an earnings call to discuss the Company's year-end 2025 financial results (the "FY 2025 Earnings Call"). On the FY 2025 Earnings Call, Defendant Kumar addressed the disappointing results of the NHS-Galleri study by revealing that "***with the benefit of hindsight, we probably should have allowed for a longer follow-up period***" and that the "***trial was designed 6 years ago, and that was the best information we had at the time.***"

9.    On this news, the price of the Company's stock fell $51.32 per share, or approximately 50.6%, from a close of $101.53 per share on February 19, 2026, to close at $50.21 per share on February 20, 2026.

10.    During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Grail, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the trial period for the NHS-Galleri trial, which was three years, and thus the screening duration, was insufficient to demonstrate whether the primary endpoint was achievable; (2) as a result, the Company's NHS-Galleri trial failed to achieve the primary endpoint of a statistically significant reduced in Stage III and IV cancers; and (3) the Company overstated the expected results from the NHS-Galleri trial. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

11.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls

Verified Shareholder Derivative Complaint

while two of the Individual Defendants engaged in improper insider sales, netting total proceeds of over $7.4 million.

12.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

13.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), its current CEO, and its Chief Scientific Officer ("CSO") to a federal securities fraud class action pending in the United States District Court for the Northern District of California (the "Securities Class Action"), which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendants Ragusa, Ofman, and Kumar's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Company's Board of

Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22. Plaintiff is a current shareholder of Grail. Plaintiff has continuously held Grail common stock at all relevant times.

### Nominal Defendant Grail

23. Grail is a Delaware corporation with principal executive offices at 1525 O'Brien Drive, Menlo Park, California 94025. Grail's common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "GRAL."

### Defendant Ragusa

Verified Shareholder Derivative Complaint

24. Defendant Ragusa served as the Company's CEO from October 2021 to June 1, 2026. Further, Defendant Ragusa served as a Company director from June 2024 to June 1, 2026.

25. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Ragusa made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 3, 2025 | 14,807 | $94.43 | $1,398,225 |
| December 3, 2025 | 15,356 | $95.28 | $1,463,120 |
| December 3, 2025 | 8,233 | $96.22 | $792,179 |
| December 3, 2025 | 1,604 | $97.28 | $156,037 |

Thus, in total, before the fraud was exposed, Defendant Ragusa sold 40,000 shares of Company stock on inside information, for which he received approximately $3.8 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

26. The Schedule 14A the Company filed with the SEC on April 28, 2026 (the "2026 Proxy Statement") stated the following about Defendant Ragusa:

Robert Ragusa has served as our Chief Executive Officer since October 2021 and as a member of our Board since June 2024. Mr. Ragusa was previously Chief Operations Officer for Illumina from December 2013 until October 2021, where he was responsible for the company's operations serving clinical and research customers. Prior to joining Illumina, Mr. Ragusa was Executive Vice President of Engineering and Global Operations at Accuray Incorporated from April 2010 until December 2013, a radiation oncology company, where he and his team were responsible for the development, manufacturing and distribution of innovative precision treatment solutions. Mr. Ragusa also previously served as Senior Vice President of Global Operations for Applied

Verified Shareholder Derivative Complaint

Biosystems from 1997 until 2005. Mr. Ragusa currently serves on the Board of Directors for Twist Bioscience Corporation, a publicly-held synthetic biology company, since December 2016. Mr. Ragusa holds a B.S. in electrical engineering and an M.B.A. from the University of Connecticut as well as an M.S. in biomedical and electrical engineering from Carnegie Mellon University.

**Defendant Ofman**

27. Defendant Ofman has served as a Company director since March 2026, and as the CEO of the Company since June 1, 2026. During the Relevant Period, from June 2021 to March 2026, Defendant Ofman served as the Company's President. Additionally, Defendant Ofman previously served as the Chief of Corporate Strategy and External Affairs from June 2019 to January 2020, the Chief Medical Officer and Head of External Affairs from June 2020 to August 2021, and as the Chief Medical Officer from November 2021 to June 2022.

28. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Ofman made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| June 30, 2025 | 9,692 | $52 | $503,984 |
| October 2, 2025 | 9,692 | $64 | $620,288 |
| October 15, 2025 | 8,865 | $76.03 | $674,006 |
| October 16, 2025 | 6,114 | $82.01 | $501,409 |
| December 3, 2025 | 13,000 | $100 | $1,300,000 |

Thus, in total, before the fraud was exposed, Defendant Ofman sold 47,363 shares of Company stock on inside information, for which he received approximately $3.6 million in proceeds. His insider sales, made with knowledge of material nonpublic information

8

Verified Shareholder Derivative Complaint

before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

29.    The 2026 Proxy Statement stated the following about Defendant Ofman:

Joshua Ofman, M.D., MSHS, has served as our President since June 2021 and previously served as our Chief Medical Officer from November 2021 until June 2022, as our Chief Medical Officer and Head of External Affairs from June 2020 until August 2021, and as Chief of Corporate Strategy and External Affairs from June 2019 until January 2020. On March 10, 2026, Dr. Ofman was also appointed to serve as our Chief Executive Officer, effective June 1, 2026. Dr. Ofman has previously served on the Board of Directors of two privately-held biotechnology companies. Previously, Dr. Ofman spent more than 15 years at Amgen, where he most recently held the role of Senior Vice President, Global Value, Access and Policy. Prior to that, Dr. Ofman was a faculty member in the Department of Medicine and Health Services Research at University of California, Los Angeles ("UCLA") School of Medicine, Division of Digestive Diseases at Cedars-Sinai Medical Center, as well as Senior Vice President of Zynx Health Inc. Dr. Ofman holds a B.A. in history and philosophy of science from the University of California, Berkeley, an M.D. from the University of California, Irvine, School of Medicine, and an MSHS from the UCLA School of Public Health.

**Defendant Kumar**

30.    Defendant Kumar has served as the CSO and President, Global Clinical and Medical Affairs since May 2026. Defendant Kumar previously served as the Chief Scientific Officer and President, International from November 2025 to May 2026, and as the International President of Grail from June 2020 to November 2025.

31.    The "Leadership Team" page on the Company's website[2] states the following about Defendant Kumar:

Sir Harpal is the Chief Scientific Officer & President, Global Clinical and Medical Affairs. He most recently served as Senior Vice President and Head of Innovation EMEA at Johnson & Johnson where he oversaw a portfolio of co-investments and collaborations across the region to grow Johnson &

---

[2] https://grail.com/members/sir-harpal-kumar/

Verified Shareholder Derivative Complaint

Johnson's networks within the EMEA innovation community. Before joining Johnson & Johnson Innovation, Sir Harpal spent 15 years with Cancer Research UK and served as the organization's Chief Executive Officer from April 2007 until June 2018. Prior to this, he was Chief Operating Officer & Executive Director of Development at CRUK and served as Chief Executive of Cancer Research Technology (a subsidiary of CRUK). Before CRUK, he worked with McKinsey & Co, The Papworth Trust, and Nexan Group. Sir Harpal received a Masters in Chemical Engineering from the University of Cambridge, and an MBA as a Baker Scholar from Harvard Business School. He has been awarded Honorary Doctorates from the Universities of Manchester, Newcastle, and Glasgow, and the Institute of Cancer Research, and he is a Fellow of The Academy of Medical Sciences. In 2016, he was knighted by Her Majesty Queen Elizabeth II for services to cancer research.

**Defendant Chase**

32.    Defendant Chase has served as a Company director since June 2024. Additionally, Defendant Chase serves as the Chairperson of the Audit Committee and as a member of both the Compensation Committee and the Nominating and Corporate Governance Committee.

33.    The 2026 Proxy Statement stated the following about Defendant Chase:

William Chase has served as a member of our Board since June 2024. Mr. Chase most recently served for 7 years in roles as Executive Vice President, Finance and Administration and Executive Vice President and Chief Financial Officer at AbbVie Inc. ("AbbVie") from October 2018 until July 2019, where he oversaw all financial, investor, and IT activities and played a critical role in the development of the company's strategy and licensing and acquisition actions. Prior to AbbVie, Mr. Chase served nearly 25 years in positions of increasing responsibility at Abbott Laboratories, including roles as Corporate Vice President, Licensing & Acquisitions, Corporate Vice President and Treasurer, and Controller, Abbott International. He currently serves as a director and as chair of the audit committee on the boards of each of Intellia Therapeutics, Inc., a publicly-traded biotechnology company, since April 2023, and Parexel International, a privately-held biopharmaceutical services company, since November 2021. Mr. Chase holds a B.S. from the University of Illinois and an M.B.A. from the University of Chicago Booth School of Business. We believe that Mr. Chase is qualified to serve as a member of our board of directors because of his extensive experience in the biotechnology

10

Verified Shareholder Derivative Complaint

and pharmaceutical industry and his extensive financial and accounting experience.

### Defendant Krevans

34.     Defendant Krevans has served as a Company director since October 2024. Defendant Krevans also serves as a member of the Compensation Committee, the Audit Committee, and the Nominating and Corporate Governance Committee.

35.     The 2026 Proxy Statement stated the following about Defendant Krevans:

Sarah Krevans has served as a member of our Board since October 21, 2024. Ms. Krevans is the former President and CEO of Sutter Health, a Northern California based not-for-profit, where she served as CEO from 2016 until 2022. She was responsible for Sutter Health's integrated network of 14,000 clinicians, 24 hospitals, outpatient services, research facilities, and home health and hospice care. Previously, Ms. Krevans served as chief operating officer and president of the Sutter Health Sacramento Sierra Region. She also held executive roles at Kaiser Permanente and served as deputy director of Maine's Bureau of Medical Services and acting director of Medicaid, health planning and licensure programs. Ms. Krevans has served as a Board Member for The Acacium Group since 2021 and is the Chair for CaringBridge, where she has served as a director since 2022. She has also served on Boards of many not-for-profit organizations and served as Chair of the California Hospital Association in 2022 and as a director from 2016 until 2022. Ms. Krevans earned master's degrees in business administration and in public health from the University of California, Berkeley, and a bachelor's degree from Boston University. We believe that Ms. Krevans is qualified to serve as a member of our board of directors because of her experience in U.S. healthcare delivery systems and her extensive industry and leadership experience.

### Defendant Mizell

36.     Defendant Mizell has served as a Company director since June 2024. Defendant Mizell also serves as the Chairperson of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee and the Audit Committee.

37.     The 2026 Proxy Statement stated the following about Defendant Mizell:

11

Verified Shareholder Derivative Complaint

Steven Mizell has served as a member of our Board since June 2024. Mr. Mizell is the former Executive Vice President and Chief Human Resources Officer at Merck & Co., Inc., where he was employed from October 2018 until his retirement on July 1, 2024. He was responsible for talent acquisition and development, employee health and wellness, total rewards, and human capital management for over 68,000 employees across the world. Mr. Mizell previously served as Executive Vice President & Chief Human Resources Officer at Monsanto Company from 2004 until 2018, where he created an industry-leading workplace for more than 20,000 employees globally. Before that, Mr. Mizell served as Senior Vice President and Chief Corporate Resources Officer for AdvancePCS Inc. and previous to that held several key human resources management roles at companies across the energy, defense, manufacturing, communications and technology sectors. He currently serves on the boards of Allegion Plc., a publicly-traded security products company, since February 2020, and Group 1 Automotive, Inc., a publicly-traded automotive retailer since March 2021, and has earned a Directorship Certification® from the National Association of Corporate Directors. Mr. Mizell holds a B.S. from Georgia Institute of Technology and an M.S. from Carnegie Mellon University. We believe that Mr. Mizell is qualified to serve as a member of our board of directors because of his extensive experience in risk management, human capital management and leadership.

**Defendant Summe**

38.    Defendant Summe has served as a Company director and Chair of the Board since June 2024. Additionally, Defendant Summe serves as the Chairperson of the Nominating and Corporate Governance Committee and as a member of both the Compensation Committee and the Audit Committee.

39.    The 2026 Proxy Statement stated the following about Defendant Summe:

Gregory Summe has served as Chair of our Board since June 2024. Mr. Summe is the Founder of investment fund Glen Capital Partners LLC and has served as the Managing Partner since June 2014. Mr. Summe previously served as Managing Director and Vice Chairman of Global Buyout at The Carlyle Group from October 2009 until June 2014. Prior to The Carlyle Group, Mr. Summe served for over a decade as Chairman, CEO, and President of PerkinElmer, Inc., a leading diagnostics and life sciences company. He also served as a Senior Advisor at Goldman Sachs Capital Partners and was the President of AlliedSignal, Inc.'s Automotive, Jet Engine, and General

12

Verified Shareholder Derivative Complaint

Avionics businesses. Previously, he was the General Manager of General Electric Commercial Motors and a Partner at McKinsey and Company. He currently serves on the boards of NXP Semiconductors N.V., a publicly-traded semiconductor company, since December 2015, Avantor, Inc., a publicly-traded Life Sciences company, since May 2020, Wheels Up Experience, Inc., a publicly traded aviation company since September 2024 and is a Senior Advisor at Star Mountain Capital, LLC. Mr. Summe previously served on the board of the State Street Corporation, a publicly-traded financial services company from 2001 until 2025, Virgin Orbit Holdings, Inc., a publicly-traded space launch services company, from January 2022 until August 2023, and on the boards of NextGen Acquisition Corp I & II from July 2020 until December 2021. Mr. Summe holds a B.S. from the University of Kentucky, an M.S. from the University of Cincinnati, and an M.B.A. from the Wharton School of the University of Pennsylvania. We believe that Mr. Summe is qualified to serve as a member of our board of directors because of his extensive corporate leadership, industry, and finance experience.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

40.    By reason of their positions as officers, directors, and/or fiduciaries of Grail and because of their ability to control the business and corporate affairs of Grail, the Individual Defendants owed Grail and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Grail in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Grail and its shareholders so as to benefit all shareholders equally.

41.    Each director and officer of the Company owes to Grail and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

42.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Grail, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

13

Verified Shareholder Derivative Complaint

43.    To discharge their duties, the officers and directors of Grail were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

44.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Grail, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

45.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

14

Verified Shareholder Derivative Complaint

46.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Grail were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Grail's Code of Business Conduct and Ethics (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Grail conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Grail and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Grail's operations would comply with all applicable laws and Grail's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders

at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

47.    Each of the Individual Defendants further owed to Grail and its shareholders the duty of loyalty requiring that each favor Grail's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

48.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Grail and were at all times acting within the course and scope of such agency.

49.    Because of their advisory, executive, managerial, directorial, and controlling positions with Grail, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

50.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Grail.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

51.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual

16
Verified Shareholder Derivative Complaint

Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

53.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Grail was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

54.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

55.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Grail and were at all times acting within the course and scope of such agency.

## GRAIL'S CODE OF ETHICS

56.     Grail's Code of Ethics states that "[a]ll employees, officers, and directors are required to adhere to this Code." In the section titled "Purpose", the Code of Ethics states, in relevant part:

All of our employees, directors, officers, contractors, distributors, agents, and consultants ("GRAIL personnel") are expected to uphold GRAIL's Commitments to Ethical Conduct:

- We maintain an unwavering commitment to ethical conduct in all activities and in all relationships.
- We foster an environment and culture of honesty, integrity and accountability.
- We promote socially responsible practices that protect patients and their rights.
- We strive to avoid even the appearance of impropriety.
- We never compromise our business conduct standards.
- We ensure that all required documented procedures are established and followed in accordance with applicable requirements.
- We conduct all of our activities in a manner that ensures continuous competence, impartiality, good judgment, and operational integrity.

57.    In the section titled "Policy," under the subsection titled "Compliance with Laws, Rules, and Regulations," the Code of Ethics states:

5.1.1 We are committed to conducting business with honesty and integrity and in compliance with all applicable laws, rules and regulations. No GRAIL personnel shall commit an illegal or unethical act, or instruct others to do so, for any reason. All activities are to be conducted in compliance with all applicable laws, rules and regulations. Employees are charged with the responsibility of understanding the applicable laws, recognizing potential dangers and knowing when to seek legal advice from GRAIL's Legal Department.

5.1.2 GRAIL is obligated to comply with all applicable laws, rules and regulations. It is the responsibility of GRAIL personnel to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his, her, or their duties for GRAIL.

5.1.3 In accordance with the requirements of the Securities and Exchange Commission (the "SEC") and of the Nasdaq Stock Market Listing Standards, the Board of GRAIL has adopted this Code to encourage as reasonably necessary:

18

Verified Shareholder Derivative Complaint

- Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;
- Full, fair, accurate, timely and understandable disclosures;
- Compliance with applicable governmental laws, rules and regulations;
- Prompt internal reporting of any violations of law or the Code;
- Accountability for adherence to the Code, including fair process by which to determine violations;
- Consistent enforcement of the Code, including clear and objective standards for compliance; and
- Protection for persons reporting any such questionable behavior.

58.    In the same section, under a subsection titled "Conflicts of Interest," the Code of Ethics states the following, in relevant part:

5.4.1  Our employees, officers and directors have an obligation to act in the best interest of GRAIL. All employees, officers and directors should endeavor to avoid situations that present a potential or actual conflict between their interest and the interest of GRAIL. All employees, officers, and directors shall conduct all activities ensuring that there are no undue commercial, financial, or other pressures and influences that may affect the work quality.

5.4.2 A "conflict of interest" occurs when a person's private interest interferes in any way, or even appears to interfere, with the interest of GRAIL. A conflict of interest may arise when an employee, officer or director takes an action or has an interest that may make it difficult for him or her to perform his or her work objectively and effectively. Conflicts of interest may also arise when an employee, officer or director (or his or her family members, in particular immediate family members) receives improper personal benefits as a result of the employee's, officer's or director's position in GRAIL. A gift, service or favor should not be accepted if it might create a sense of obligation, compromise your professional judgment, influence or be perceived to influence business decisions or would negatively affect GRAIL's reputation if publicly disclosed.

***

5.4.5 All employees, officers and directors are required to report all potential

19

Verified Shareholder Derivative Complaint

or existing conflicts of interest as soon as they arise. All such potential or existing conflicts should be reported to the Legal Department or the Chief Compliance Officer at compliance@grailbio.com. Conflicts of interests involving the General Counsel and directors shall be disclosed to the Nominating and Corporate Governance Committee of the Board (the "Nominating Committee"). In addition, the Legal Department shall notify the Nominating Committee of any disclosure from an executive officer or director of any material transaction or relationship that could be expected to give rise to a conflict.

59.     In the same section, under a subsection titled "Accuracy of Business Records," the Code of Ethics states the following:

All financial books, records and accounts must accurately reflect transactions and events, and conform both to generally accepted accounting principles (GAAP) and to GRAIL's system of internal controls. No entry may be made that intentionally hides or disguises the true nature of any transaction. All employees, officers and directors should therefore attempt to be as clear, concise, truthful and accurate as possible when recording any information.

60.     In the same section, under a subsection titled "Disclosures," the Code of Ethics states the following:

The information in GRAIL's public communications, including all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable. To ensure GRAIL meets this standard, all employees, officers and directors (to the extent they are involved in GRAIL's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to GRAIL commensurate with their duties. Employees, officers and directors are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit material facts about GRAIL to others, including GRAIL's independent auditors, governmental regulators and self-regulatory organizations.

61.     In the same section, under a subsection titled "Corporate Opportunities," the Code of Ethics states the following:

Employees, officers and directors are prohibited from taking for themselves business opportunities that are discovered through the use of corporate property, information or position. No employee, officer or director may use

20

Verified Shareholder Derivative Complaint

corporate property, information or position for personal gain, and no employee, officer or director may compete with GRAIL. Competing with GRAIL may involve engaging in the same line of business as GRAIL, or any situation where the employee, officer or director takes away from GRAIL opportunities for sales or purchases of products, services or interests. Employees, officers and directors owe a duty to GRAIL to advance its legitimate interests when the opportunity to do so arises.

62. In the same section, under a subsection titled "Fair Dealing; Customer and Government Interactions," the Code of Ethics states the following, in relevant part:

5.9.1 Each employee, officer and director of GRAIL should always deal fairly with customers, suppliers, competitors, the public and one another at all times and in accordance with ethical business practices. No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice. We are committed to following guidelines with respect to competitive information:

- Use only appropriate methods for collecting competitive information;

- Do not lie or misrepresent yourself when gathering information;

- If you receive a competitor's confidential information inadvertently, do not copy or forward it to others; and immediately report the incident to your supervisor or the Legal Department and follow their instructions;

- Do not recruit people with the intent to obtain any third-party confidential information; and

- Communicate to agents, distributors, suppliers, consultants or other business partners that they must observe these guidelines when acting on behalf of GRAIL

63. In the same section, under a subsection titled "Insider Trading," the Code of Ethics states the following:

Trading on inside information is a violation of federal securities law. All employees, officers and directors in possession of material non-public information about GRAIL or companies with whom we do business must abstain from trading or advising others to trade in the respective company's

21

Verified Shareholder Derivative Complaint

securities from the time that they obtain such inside information until adequate public disclosure of the information. Material information is information of such importance that it can be expected to affect the judgment of investors as to whether or not to buy, sell, or hold the securities in question. To use non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal. All employees, officers and directors who trade stock based on insider information can be personally liable for damages totaling up to three times the profit made or loss avoided by the respective employee, officer or director. You are required to read carefully and observe our Insider Trading Compliance Policy and Procedures, as amended from time to time. Please contact GRAIL's Insider Trading Compliance Officer with any questions you may have about insider trading laws.

64.    In the same section, under a subsection titled "Non-Retaliation," the Code of Ethics states the following:

5.16.1 You have the right to:

- Report possible violations of law or regulation that have occurred, are occurring, or are planned to occur to any governmental agency or entity or self-regulatory organization;

- Cooperate voluntarily with, or respond to any inquiry from, or provide testimony before any self-regulatory organization or any other federal, state or local regulatory or law enforcement authority;

- Make reports or disclosures to law enforcement or a regulatory authority without prior notice to, or authorization from, GRAIL; and

- Respond truthfully to a valid subpoena.

5.16.2 Further, you are required to report all suspected violations of GRAIL's policies or applicable laws, rules or regulations to your supervisor, the Chief Compliance Officer (compliance@grailbio.com), the Legal Department, or GRAIL's Ethics and Compliance Hotline (1-800-461-9330 or go.grail.com/hotline).

5.16.3 You have the right to not be retaliated against for reporting, either internally to GRAIL or to any governmental agency or entity or self-

Verified Shareholder Derivative Complaint

regulatory organization, information that you reasonably believe relates to a possible violation of law. It is unlawful for GRAIL to retaliate against you or anyone who has reported such potential misconduct either internally or to any governmental agency or entity or self-regulatory organization in good faith. Retaliatory conduct includes discharge, demotion, suspension, threats, harassment, and any other manner of discrimination in the terms and conditions of employment because of any lawful act you may have performed.

5.16.4 Notwithstanding anything contained in this Code or otherwise, you may disclose confidential GRAIL information, including the existence and terms of any confidential agreements between yourself and GRAIL (including employment or severance agreements), to any governmental agency or entity or self-regulatory organization.

5.16.5 GRAIL cannot require you to withdraw reports or filings alleging possible violations of federal, state or local law or regulation, and GRAIL may not offer you any kind of inducement, including payment, to do so.

5.16.6 Your rights and remedies as a whistleblower are protected under applicable whistleblower laws, including a monetary award, if any, may not be waived by any agreement, policy form or condition of employment, including by a pre-dispute arbitration agreement.

5.16.7 Even if you have participated in a possible violation of law, you may be eligible to participate in the confidentiality and retaliation protections afforded under applicable whistleblower laws, and you may also be eligible to receive an award under such laws.

65.     In the same section, under a subsection titled "Waivers and Amendments," the Code of Ethics states the following:

Any waiver of the provisions in this Code may only be granted by the Board. Before an employee, or an immediate family member of any such employee, engages in any activity that would be otherwise prohibited by the Code, he or she is strongly encouraged to obtain a written waiver from the Board. Before a director or executive officer, or an immediate family member of a director

23

Verified Shareholder Derivative Complaint

or executive officer, engages in any activity that would be otherwise prohibited by the Code, he or she must obtain a written waiver from the disinterested directors of the Board. Such waiver must then be disclosed to GRAIL's shareholders, along with the reasons for granting the waiver.

Amendments to this Code must be approved by the Board.

66. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Additionally, two of the Individual Defendants violated the Code of Conduct by engaging in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants breaching their fiduciary duties to the Company by causing the Company to issue false and misleading statements. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Grail's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## GRAIL'S AUDIT COMMITTEE CHARTER

67. The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). In a section titled "Purpose and Scope," the Audit Committee Charter states:

The Audit Committee (the "Committee") is created by the Board of Directors (the "Board") of GRAIL, Inc. ("GRAIL") to discharge the responsibilities set forth in this Charter, including overseeing the accounting and financial reporting processes of GRAIL and the audits of the financial statements of GRAIL. The Committee shall have the authority and membership and shall operate according to the procedures provided in this Charter.

68. In the section titled "Responsibilities," the Audit Committee Charter states the

24

Verified Shareholder Derivative Complaint

following:

> The basic responsibility of the members of the Committee is to exercise their business judgment to act in what they reasonably believe to be in the best interests of GRAIL and its stockholders. The Committee's responsibilities are limited to oversight. GRAIL's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing GRAIL's financial statements. GRAIL's independent auditors are responsible for auditing and reviewing those financial statements. In discharging that obligation, members should be entitled to rely on the honesty and integrity of GRAIL's senior executives and its outside advisers and auditors, to the fullest extent permitted by law. In addition to any other responsibilities which may be assigned from time to time by the Board, the Committee is responsible for the following matters.

69. In the same section, under the subsection "Financial Statements: Disclosure and Other Risk Management and Compliance Matters," the Audit Committee Charter states:

- The Committee shall meet to review and discuss with management and the independent auditor, and make recommendations to the Board regarding, the annual audited financial statements and unaudited quarterly financial statements, including reviewing GRAIL's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," for inclusion in and prior to the filing of GRAIL's Form 10-K or Form 10-Q with the SEC.

- The Committee shall review with management and the independent auditor, whenever the Committee deems appropriate:

  - any analyses or other written communications prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and

  - the critical accounting policies and practices of GRAIL.

- The Committee, or the Chair of the Committee, may review GRAIL's earnings press releases and financial guidance and make recommendations to the Board, if any.

- The Committee shall, in conjunction with the Chief Executive Officer and Chief Financial Officer of GRAIL, review GRAIL's disclosure controls and procedures and internal control over financial reporting. The review of internal control over financial reporting shall include whether there are any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to affect GRAIL's ability to record, process, summarize and report financial information and any fraud involving management or other employees with a significant role in internal control over financial reporting.

- The Committee shall review and discuss with the independent auditor any audit problems or difficulties and management's response thereto, including those matters required to be discussed with the Committee by the auditor pursuant to established auditing standards, as amended.

- In connection with its oversight responsibilities, the Committee shall be directly responsible for the resolution of disagreements between management and the auditor regarding GRAIL's financial reporting.

- The Committee shall review GRAIL's policies and practices with respect to risk assessment and risk management, including discussing with management GRAIL's major financial risk exposures and the steps that have been taken to monitor and control such exposures.

- The Committee shall review GRAIL's cybersecurity and other information technology risks, controls, and procedures, including GRAIL's plan to mitigate cybersecurity risks and respond to data breaches. The Committee shall also review with management any specific cybersecurity issues that could affect the adequacy of GRAIL's internal controls.

- The Committee shall review GRAIL's policies and practices with respect to related party transactions and review such transactions subject to the requirements of such policies.

- The Committee shall oversee the enforcement of the Code of Business Conduct and Ethics.

Verified Shareholder Derivative Complaint

- The Committee shall cause GRAIL to implement, maintain, and monitor an ethics hotline that is designed to receive anonymous reports of any known or suspected violations of GRAIL's Code of Business Conduct and Ethics or any applicable laws and regulations. The Chief Compliance Officer will investigate any reports received through the ethics hotline and report to the Audit Committee and the Board periodically with respect to the information received through the ethics hotline and any related investigations.

- The Committee shall establish procedures for:

  - the receipt, retention, and treatment of complaints received by GRAIL regarding accounting, internal accounting controls, or auditing matters; and

  - the confidential, anonymous submission by employees of GRAIL of concerns regarding questionable accounting or auditing matters.

- The Committee shall prepare the Committee report that the SEC rules require to be included in GRAIL's annual proxy statement.

- The Committee shall review GRAIL's compliance with laws and regulations, including major legal and regulatory initiatives.

70. In the same section, under the subsection, "Reporting to the Board," the Audit Committee Charter states the following:

- The Committee shall report to the Board periodically. This report shall include a review of any issues that arise with respect to the quality or integrity of GRAIL's financial statements, GRAIL's compliance with legal or regulatory requirements, the independence and performance of GRAIL's independent auditor, and any other matters that the Committee deems appropriate or is requested to include by the Board.

- The Committee shall review and assess the adequacy of this charter annually and recommend any proposed changes to the Board for approval.

71. In the same section, under the subsection, "Compliance Matters," the Audit Committee Charter states the following:

Verified Shareholder Derivative Complaint

The Committee shall have oversight of GRAIL's compliance program and policies related to compliance with laws and regulations, and shall ensure the Chief Compliance Officer has sufficient independence, access and resources to encourage ethical conduct and compliance with laws and regulations and implementation of an effective compliance program. Such oversight will include the review, with the Chief Compliance Officer and management, of the organizational structure, staffing, and implementation of the GRAIL's compliance programs relating to the GRAIL's principal legal and regulatory compliance risks, the related policies and procedures, training processes, and the adequacy of the resources for these programs.

- *Compliance Program*. The Committee will oversee the activities of, and meet regularly with, GRAIL's Chief Compliance Officer, and receive reports from the Chief Compliance Officer regarding the structure and activities of GRAIL's compliance program, including updates on training, policies, auditing and monitoring, investigations and any corrective and preventive actions. The Committee may also meet separately with the Chief Compliance Officer to discuss any matters that the Committee or the Chief Compliance Officer believes should be discussed privately. The Committee shall provide such guidance and support as the Chief Compliance Officer may request from time to time.

- *Governmental Agreements*. The Committee will oversee, monitor, and evaluate GRAIL's compliance with and implementation of the terms of any settlement agreements that may be entered into with governmental authorities.

- *Regulatory and Enforcement Developments*. The Committee will periodically receive information from the Chief Compliance Officer and/or management about current and emerging risks and regulatory and enforcement trends, governmental inquiries, or third party claims that are likely to affect GRAIL's business operations, performance, or strategy.

(Emphasis in original).

72.   In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches

of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

73.    Grail is a commercial-stage healthcare company that focuses on early cancer detection through screening methodology. The Company's primary purpose is to screen individuals for multiple types of cancer with a single test.

74.    In particular, Grail is developing a multi-cancer early detection test, Galleri, that can screen for multiple types of cancer at once. Galleri analyzes blood samples to screen for various cancers, identify the affected tissue type or organ of origin, and assist in the screening process.

75.    Beginning in 2021, Grail initiated its NHS-Galleri trial, which had a primary objective to assess whether Galleri could reduce late-stage, Stage III and IV, cancers through early cancer detection. The NHS-Galleri trial period was three years, running from 2021 to July 2024. In May 2024, Grail decided not to initiate an implementation pilot prior to the availability of the final trial results, meaning the Company opted to evaluate the final results from the third round of screening before taking further action. Grail anticipated announcing its topline results from the NHS-Galleri trial in February 2026.

76.    Despite an insufficient trial period length, during the Relevant Period, the Individual Defendants misled investors with overwhelmingly positive statements about the NHS-Galleri trial's likelihood of success in achieving its primary endpoint of a statistically significant reduction in Stage III and IV cancer.

### False and Misleading Statements

29

*May 13, 2025 Earnings Release*

77.    On May 13, 2025, the Company issued a press release titled "GRAIL Reports First Quarter 2025 Financial Results," which announced "Positive Top-Line Results from the Prevalent Screening Round of the NHS-Galleri Trial" (the "1Q 2025 Earnings Release").

78.    The 1Q 2025 Earnings Release stated, in relevant part:

GRAIL recently completed a review of Galleri test performance results in the intervention arm from the prevalent screening round of the registrational NHS-Galleri trial. *The prevalent screening round is the first round of blood draws (of the three total blood draw rounds in the trial) with one year of follow up.*

*Data from the prevalent screening round showed a substantially higher positive predictive value (PPV) than that observed in the PATHFINDER study*, which was previously published in *The Lancet*. *Cancer signal of origin (CSO) accuracy and specificity were consistent with that observed in the PATHFINDER study*. In PATHFINDER, Galleri demonstrated a PPV of 43%, CSO accuracy of 88%, and specificity of 99.5%. There were no serious safety concerns in the NHS-Galleri prevalent screening round, also consistent with the PATHFINDER study.

\*\*\*

*The NHS-Galleri trial was designed with three consecutive years of screening in order to achieve the primary endpoint, which is the absolute reduction in the number of late stage (stages 3 and 4) cancer diagnoses.* Final clinical utility results from all three years of the trial are expected in mid-2026. GRAIL plans to submit data from the prevalent screening round of the NHS-Galleri trial as part of our premarket approval application in the first half of 2026

79.    Further, in the 1Q 2025 Earnings Release, Defendant Ragusa was quoted as noting that the Company was "very pleased with these initial results from the NHS-Galleri trial" and that the final results from the NHS-Galleri trial were expected in mid-2026.

*May 13, 2025 Earnings Call*

80.    That same day, the Company hosted the 1Q 2025 Earnings Call to discuss the

Verified Shareholder Derivative Complaint

first quarter results of 2025. During the 1Q 2025 Earnings Call, the Individual Defendants further addressed the initial top-line results from the NHS-Galleri trial.

81.    On the 1Q 2025 Earnings Call, Defendant Kumar stated, in relevant part:

I'm pleased to share high-level Galleri test performance results from the intervention arm of the prevalent screening round of our 140,000 participant 3-year NHS-Galleri registrational trial. The prevalent screening round was the first round of blood draws with 1 year of follow-up.

*We were pleased to see a substantially higher PPV than the 43% observed in the PATHFINDER study. We also saw specificity and cancer signal of origin or CSO, consistent with our PATHFINDER study, which was an interventional return of results study evaluating the performance of Galleri.*

\* \* \*

As a reminder, Galleri demonstrated specificity of 99.5% and a CSO accuracy of 88% in PATHFINDER. There were no serious safety concerns in the NHS-Galleri prevalence screening round, also consistent with the PATHFINDER study. As Bob mentioned, *the top line results from the prevalent screening round of the NHS-Galleri trial are very encouraging*. Results of all the 3 years of the trial are expected in mid-2026. These longitudinal results will be the first clinical utility results of their kind in the MCED field.

The NHS-Galleri trial was designed as 3 annual blood draws plus 12 months of follow-up in order to evaluate Galleri's ability to diagnose cancer at an earlier stage relative to standard of care. *Cancer screening trials designed to show clinical utility are commonly conducted over 3 or more years using an annual screening interval. Because if screening is only conducted once, results can be influenced by the fact that the first screening round, detects many prevalent late-stage asymptomatic cancers that have not yet been diagnosed. This and other factors are likely to cause final results of the 3-year trial to differ from a review of the first round results.*

82.    During his own remarks, Defendant Ofman reassured investors that the drug "is working" and touted the promising initial trial results, stating, in relevant part:

Now let's be clear, *Galleri is working in the real world. We are detecting clinically meaningful cancers and early-stage cancers in asymptomatic adults.*

31

Verified Shareholder Derivative Complaint

*Our signal detection rate in commercial use is very much in line with what we expected based on our prior clinical studies*. The majority of the early-stage cancers Galleri has found are in cancer types where a recommended screening test does not even exist, thereby allowing patients an opportunity to access more effective and even curative treatments.

Now we've described over time the key performance metrics, features and capabilities for multi-cancer early detection tests, which importantly are quite different from those for single cancer screenings. *Positive predictive value or PPV is a key metric, which discerns among positive test results, how many are true positives.* Specificity, critically important, defines the false positive rate, a very low false positive rate helps reduce unnecessary workups and their associated costs and contribute to driving a high positive predictive value. Our demonstrated specificity at 99.5% equates to a false positive rate of 0.5%.

\*\*\*

*Galleri indeed identified cancers across this large intended use population, including early-stage cancers and cancers without recommended screening.* Generally, the test performance in this real-world setting remain consistent with what we've consistently observed in our prior clinical studies.

83. Additionally, on the 1Q 2025 Earnings Call, Defendants Ragusa and Kumar participated in a question-and-answer segment, where analysts inquired about how the initial topline results will translate to the second and third screening round results. On the 1Q 2025 Earnings Call, Defendants Ragusa and Kumar elaborated on the expectations of the future screening results, in relevant part:

<Q: Tejas Savant – Morgan Stanley – Senior Healthcare Equity Analyst> So the intervention arm from the NHS-Galleri, that data that you just shared. How should we be thinking about the read across from that to your next year's final NHS-Galleri readout, like particularly in terms of that higher PPV you highlighted? And can you put a finer point on when in the second half of the year, we can expect PATHFINDER 2 data?

<A: Defendant Ragusa> Yes. So on the second question, we're looking to mid next year to have the readout on the full 3-year study. We also have Harpal on the call today. So Harpal, maybe answering the first part of that question.

Verified Shareholder Derivative Complaint

<A: Defendant Kumar> Yes, sure. Thank you for the question. So look, the -- it's important just to reiterate that *the results we've shared today are from the first screening round only. And as we've tried to describe, it's really important that the first round of a screening program, what you typically see is that you are finding a lot of prevalent cancers in the population that have not yet been diagnosed*. They are asymptomatic, but they can often be very late stage. And so as we go through to the second and third rounds, and those prevalent cancers in the population have already been diagnosed, *we would expect to see some differences in the second and third round as indeed has other screening programs in the past. But we're not in a position today to be able to predict what those results will be*. But we will have those results in mid-'26.

84.     Later, on the 1Q 2025 Earnings Call, Defendants Ragusa and Harpal responded to an analyst's question regarding details on the NHS-Galleri results, in pertinent part:

<Q: Kyle Alexander Mikson – Canaccord Genuity Corp. – Director & Senior Equity Research Analyst> Just on NHS first, just given the data here and the partnership in the study keep progressing. How are the recent conversations with NHS going? And do you -- what do you expect they're going to do, I guess, with Galleri commercialization in the country following the full readout in 2026.

And then secondly for maybe Harpal, on the PPV for the subset here that you provided, is that like a modeled number? Or is that like a concrete metric? I just want to kind of understand if it's like how the number should be used, and if it's like – how materially higher it is compared to like PATHFINDER, for example?

<A: Defendant Ragusa> Harpal, you want to take?

<A: Defendant Kumar> Yes, sure. Thanks, Bob. So let me quickly take the second question first. So when we say the PPV was substantially higher in the first round, that's a concrete number. *We're not sharing what that number is, but we can say it's substantially higher than the 43% that we saw in PATHFINDER*. So it's not a modeled number.

With respect to the conversations with the NHS, I mean, just to say that we are in constant dialogue with the NHS and with the national screening committee in the U.K. and with the government in the U.K., *they are clear*

Verified Shareholder Derivative Complaint

*that they want to wait to see final results from all 3 rounds of the study before they will make a decision as to if and when to roll out a screening program in the U.K. or in England particularly.* So I can't give you anything more concrete than that at this point, other than to say we're in constant dialogue.

<A: Defendant Ragusa> Harpal, maybe go through a little bit of *why not reveal the numbers right now?*

<A: Defendant Kumar> Yes, sure. So I mean, it's important to reiterate that the NHS-Galleri trial was designed as a 3-year screening study. In other words, we do 3 rounds of screening. And that's very common in screening trials and studies of screening because for the reasons that I stated earlier on the call, *if you only look at one round of screening, then what you'll typically find in that first round is a lot of prevalent asymptomatic cancers in the population, which can often be late stage, but haven't yet been diagnosed.*

By going to a second and third round, you start to see what the impact of a, if you like, a more established or steady-state screening program might be. And so it's *really important that we safeguard those upcoming readouts and the integrity of the trial as a whole. It's also really important that we safeguard the interest of the participants taking part in the trial. And so for all of those reasons, we're not sharing more detailed information at this stage*, but we are now getting closer to having the final results middle of next year, and we look forward to sharing all of those, both with all of you, but also with the NHS at that time.

85.    The statements referenced above in ¶¶77-84 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the trial period, which was three years, and thus the screening duration, was insufficient to demonstrate whether the primary endpoint was achievable; (2) as a result, the Company's NHS-Galleri trial failed to achieve the primary endpoint of a statistically significant reduced in Stage III and IV cancers; (3) the Company overstated the expected results from the NHS-Galleri trial; and (4) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

*May 29, 2025 Annual Stockholder Meeting*

34

Verified Shareholder Derivative Complaint

86. On May 29, 2025, the Company hosted its Annual Meeting of Stockholders (the "2025 Annual Meeting"). Prior to the 2025 Annual Meeting, on April 15, 2025, the Company filed a Schedule 14A with the SEC (the "2025 Proxy Statement"). Defendants Ragusa, Summe, Krevans, Mizell, and Chase solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

87. The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*, (1) re-elect Defendant Chase as a Class I Director to hold office until the Annual Meeting of Stockholders in 2028; and (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the year ended on December 31, 2025.

88. Regarding the "Board Leadership Structure and Role in Risk Oversight," the 2025 Proxy Statement stated:

Our Amended and Restated Bylaws and Corporate Governance Guidelines provide our Board of Directors with flexibility to combine or separate the positions of Chair of the Board and Chief Executive Officer in accordance with its determination that utilizing one or the other structure would be in the best interests of our Company. We currently have a non-employee Chair of the Board and a majority of our Board is comprised of independent directors. Our Board believes that separation of the positions of Chair and Chief Executive Officer, combined with the independent leadership of each of our Board committees, reinforces the independence of the Board from management, creates an environment that encourages objective oversight of management's performance and enhances the effectiveness of the Board as a whole. For these reasons, our Board of Directors has concluded that our current leadership structure is appropriate at this time.

However, our Board of Directors will continue to periodically review our leadership structure and may make such changes in the future as it deems appropriate. Our Corporate Governance Guidelines provide that, where the Chair of the Board is a member of management or not independent, the independent directors may elect a Lead Director. If appointed, the Lead Director's responsibilities would include, but are not limited to, presiding over all meetings of the Board at which the Chair of the Board is not present,

Verified Shareholder Derivative Complaint

including any executive sessions of the independent directors; approving Board meeting schedules and agendas; and acting as the liaison between the independent directors and the Chief Executive Officer and Chair of the Board.

Risk assessment and oversight are an integral part of our governance and management processes. Our Board of Directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with the Board of Directors at regular Board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks. Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of the Board of Directors that address risks inherent in their respective areas of oversight.

In particular, our Board of Directors is responsible for monitoring and assessing strategic risk exposure and our Audit Committee is responsible for reviewing our policies and practices with respect to risk assessment and risk management, including discussing with management GRAIL's major financial risk exposures and the steps that have been taken to monitor and control such exposures. The Audit Committee also reviews our cybersecurity and other information technology risks, controls, and procedures, including GRAIL's plan to mitigate cybersecurity risks and respond to data breaches. The Audit Committee also reviews with management any specific cybersecurity issues that could affect the adequacy of GRAIL's internal controls. The Audit Committee also monitors compliance with legal and regulatory requirements and considers and approves or disapproves any related person transactions. Our Nominating and Corporate Governance Committee monitors reviews and assesses the adequacy of our Corporate Governance Guidelines. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs have the potential to encourage excessive risk-taking. The Board does not believe that its role in the oversight of our risks affect the Board's leadership structure.

89.    Regarding the Company's Code of Ethics, the 2025 Proxy Statement provided:

Verified Shareholder Derivative Complaint

We have a written Code of Business Conduct and Ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. We have posted a current copy of the Code of Business Conduct and Ethics on our website, *https://investors.grail.com/corporate-governance/governance-overview*. In addition, we intend to post on our website all disclosures that are required by law or the rules of Nasdaq concerning any amendments to, or waivers from, any provision of the Code of Business Conduct and Ethics.

90. Regarding the Company's Audit Committee, the 2025 Proxy Statement stated that the Audit Committee is responsible for the following:

- appointing, retaining, compensating, and overseeing the work of our independent registered public accounting firm;
- assessing the independence and performance of the independent registered public accounting firm;
- reviewing with our independent registered public accounting firm the scope and results of the firm's annual audit of our financial statements;
- overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the financial statements that we will file with the SEC;
- pre-approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm;
- reviewing policies and practices related to risk assessment and management;
- reviewing our accounting and financial reporting policies and practices and accounting controls, as well as compliance with legal and regulatory requirements;
- reviewing, overseeing, approving, or disapproving any related-person transactions;
- reviewing with our management the scope and results of management's evaluation of our disclosure controls and procedures and management's assessment of our internal control over financial reporting, including the related certifications to be included in the periodic reports we will file with the SEC; and
- establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls, or auditing matters, or other ethics or compliance issues.

Verified Shareholder Derivative Complaint

91.     Defendants Ragusa, Summe, Krevans, Mizell, and Chase caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the trial period, which was three years, and thus the screening duration, was insufficient to demonstrate whether the primary endpoint was achievable; (2) as a result, the Company's NHS-Galleri trial failed to achieve the primary endpoint of a statistically significant reduced in Stage III and IV cancers; (3) the Company overstated the expected results from the NHS-Galleri trial; and (4) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

92.     The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

93.     As a result of material misstatements and omissions, at the Company's 2025 Annual Meeting on May 29, 2025, Company shareholders voted to: (1) re-elect Defendant Chase as a Class I Director to hold office until the Annual Meeting of Stockholders in 2028, therefore allowing him to continue breaching his fiduciary duties to the Company; and (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the year ended on December 31, 2025.

***August 12, 2025 Earnings Call***

94.     On August 12, 2025, the Company released its second quarter results for FY 2025 and later held the 2Q 2025 Earnings Call to address the results as well as provide updates on the NHS-Galleri study.

95.     Notably, on the 2Q 2025 Earnings Call, Defendant Ofman discussed the NHS-Galleri study, stating, in relevant part:

Verified Shareholder Derivative Complaint

You will recall in May that we completed a review of Galleri test performance results in the intervention arm from the prevalent screening round of the registrational NHS Galleri trial. ***Data from the prevalence screening round showed a substantially higher positive predictive value than that observed in the first PATHFINDER study***. Specificity and CSO accuracy were consistent with that observed in the first PATHFINDER study. And again, there were no serious safety concerns observed in PATHFINDER 2, also consistent with the first PATHFINDER study. ***These top line findings from NHS Galleri and PATHFINDER 2 confirm and extend what we already know about our multicancer early detection technology.*** The technology has been validated through many robust studies, including intended-use populations and through hundreds of thousands of commercial and clinical study test results showing very consistent results.

96.     Later, during the 2Q 2025 Earnings Call, Defendant Kumar confirmed that the primary endpoint of the NHS-Galleri study was initially intended to "deliver a statistically significant result" by the end of the three-year trial. However, he failed to mention any new information discovered after Grail completed its internal review of the first-round screening results, stating, in relevant part, as follows:

<Q: Yuko Oku – Equity Analyst> Great. And if I could squeeze 1 more in, if I may. Could you elaborate on the statistical powering of the NHS Galleri study? What difference is the [trial powered] to detect on the primary endpoint of reduction in the incidence of late-stage cancer versus the control arm? And what result will be viewed as meaningful benefit?

* * *

<A: Defendant Kumar> Yes. Sure. So I mean the study is powered to show a significant reduction in late-stage cancer. So we -- the primary endpoint is a reduction in Stage III and IV cancers. And we look first at the 12 cancers that represent about 2/3 of all cancer mortality and then we go on to look at all cancers from there. So we will be looking at that late-stage reduction. We don't have a specific reduction in mind, but it's -- ***but the size of the study was set to be able to deliver a statistically significant result in terms of that reduction. So we will see what that reduction ends up being***. We're interested, obviously, both in reduction of Stage III and IV cancers, but also Stage IV cancers because ultimately, people primarily die of Stage IV cancer. ***So if we can see significant reductions in those late-stage cancers, we believe***

Verified Shareholder Derivative Complaint

*this will provide substantial benefit to the population.*

97.     Further, during a question-and-answer segment on the 2Q 2025 Earnings Call, Defendants Ragusa and Kumar noted that the NHS-Galleri final results, which the Company anticipated being released in mid-2026, would advance Grail's position in the global market, in pertinent part:

<Q: Colleen Wohlrab Babington – Wolfe Research LLC – Research Analyst> This is Colleen on for Doug. As the NHS data reads out next year, we think that could serve as a strong evidence package for other international opportunities with single-player systems. How are your conversations with territories across the globe looking deploy Galleri?

Also, if international volume grows sufficiently, will you have to do a tech transfer to international labs?

<A: Defendant Ragusa> Yes, it's a great question. So *we get a tremendous amount of inbound interest, as you can imagine, from around the globe*. And with that, we've had numerous conversations. We also believe, as you rightly pointed out that in middle of next year, from an efficiency standpoint, effectiveness standpoint, *in the middle of next year when we read out the NHS Galleri study, we think that's going to be a great calling card to really have significant discussions with a lot of countries around the globe*, both due to just the sheer size of the study, but also the rigor and reputation those studies done on the NHS. I think that reputational advantage will go a long way as we have those conversations.

Harpal, anything you want to add with that?

<A: Defendant Kumar> I think you've largely covered it, Bob. I mean as you said, this is a *very large study conducted extremely well* in a health system that is very well respected around the world. So we fully expect that the results from this study will be and are being observed by countries right across the world. We're getting, as Bob said, a lot of inbound interest from pretty much every country around the world, and *we expect that the results in the middle of next year will provide us with the data to really turn those conversations into meaningful opportunities as we look forward.* And as you alluded to, *should give us a substantial growth opportunity as we look forward*.

***September 9, 2025 Morgan Stanley 23rd Annual Global Healthcare Conference***

98.   On September 9, 2025, Defendant Ragusa presented on behalf of the Company at the Morgan Stanley 23rd Annual Global Healthcare Conference (the "Morgan Stanley Healthcare Conference"). During the Morgan Stanley Healthcare Conference, Defendant Ragusa provided details on the status of the final results for the NHS-Galleri trial, in relevant part, as follows:

<Q: Yuko Oku – Morgan Stanley – Equity Analyst> Okay. To start, could you provide a quick overview of GRAIL's mission for folks that are not as familiar with the story? And what are you focused on over the next 12 months?

<A: Defendant Ragusa> . . . And so what we're looking forward to the next 12 months. So we've just read out over the summer, our NHS Galleri study, where we found substantially higher positive predictive value than PATHFINDER. So PATHFINDER [was] already at 43%. In our PATHFINDER-2 study, we gave the top line results, again, substantially higher positive predictive value and higher cancer detection rate. And in both studies, the specificity or false positive rate was consistent as well as the cancer signal of origin accuracy was very consistent and no adverse events in those studies.

So we're really looking forward to it. We submitted and are hopeful we'll be able to present at ESMO in October with our PATHFINDER-2 full data readout. And then in the middle of next year, the full readout on the NHS Galleri study. So again, PATHFINDER-2 was 35,000 people and NHS Galleri 140,000 people. So large studies. And then the other big thing next year is we're looking in the first half of 2026 to submit our final module for our PMA to the FDA.

99.   Defendant Ragusa elaborated further, addressing the length of the NHS-Galleri trial, in pertinent part:

<Q: Yuko Oku – Morgan Stanley – Equity Analyst> So I want to jump into NHS Galleri. You shared top line results from NHS Galleri trial as well, which also showed substantially higher PPV in the first round of blood draws than observed in PATHFINDER, though PPV may decline in the subsequent blood draws. Similar to the question on PATHFINDER-2, are there any key

Verified Shareholder Derivative Complaint

differences in the population enrolled in NHS Galleri, or is -- or its design that may have driven PPV higher than in the PATHFINDER?

<A: Defendant Ragusa> Yes, it's a good question. So in NHS Galleri, similar to PATHFINDER-2, we went to extraordinary lengths to make sure that we had a population that was representative of the U.K. So we looked across ethnicity to make sure we had the match ethnicity mix as well as socioeconomic scale. So in the U.K., they actually have scales for in quadrants. And so we made sure those all match. So we're very comfortable that the population is very representative, likely one of the things that changed the incidents that would have impacted the PPV.

Anytime you have that culling effect in the first round, you could have an impact on PPV as you go into future rounds. That's definitely a possibility. But *the important element within the NHS Galleri that sets us aside is an interventional longitudinal 3-year study with a year of follow-up. So it's actually looking for clinical utility. So we're looking for stage shifts, so reduction in late-stage cancers in the intervention arm compared to the control arm. So look at Stage 3 and 4 reduction versus the control arm* as well as the Stage 4 reduction versus the control arm. *So we should be able to get a measure of clinical utility out of that.* And that will all come out in the middle of next year.

100.   During the Morgan Stanley Healthcare Conference, Defendant Ragusa also detailed a promising future for the NHS-Galleri study, in relevant part, as follows:

<Q: Yuko Oku> Great. And then just in the last couple of minutes here, I want to wrap up with a bigger picture question. What about GRAIL's story do you feel is underappreciated by investors?

<A: Defendant Ragusa> Yes. So I think -- I'm not sure about underappreciated, but if we look -- if we kind of just look to the future, one of the big things we have coming out is what we've already done in terms of GRAIL being the only NSAID with demonstrated capability in the intended-to-us population of people being screened for cancer. We have -- mid next year, we have the readout on clinical utility. *So it will be great to see out of the NHS Galleri study, the clinical utility. We'll be in process of FDA approval. So we submit in the first half of next year. We expect about a 1-year process for that to get the FDA approval.*

*October 20, 2025 Conference Call*

101.   On October 20, 2025, the Company hosted a conference call primarily to

Verified Shareholder Derivative Complaint

address the results of another Galleri study, PATHFINDER 2 (the "October 2025 Conference Call").

102.   During a question-and-answer segment on the October 2025 Conference Call, Defendant Ofman expressed his increased confidence in a positive outcome of the NHS-Galleri study based on the success of the PATHFINDER 2 study, in relevant part, as follows:

> <Q: Douglas Anthony Schenkel – Wolfe Research, LLC – MD, Senior Research Analyst, and Head of Life Science & Diagnostic Tools> A few topics, on clinical utility, as we've seen in the past, FDA approval does not always translate to CMS reimbursement. Ultimately, the key dynamic will be likely stage shift, as you acknowledged in your prepared remarks as a proxy for survival benefit. Is there anything in PATHFINDER 2 that makes you more comfortable about a positive outcome on this metric when we head to NHS Galleri? Or ultimately, do we just need to wait for the readout?
>
> And building off of that, given FDA requirements outlined at the FDA panel on MCED in 2023, what boxes have you checked with the FDA and what remains to be done? So essentially trying to get at the clinical utility question, which would be key to reimbursement and then separately, the regulatory question in the U.S. with the FDA.
>
> <A: Defendant Ofman> No. Doug, really good questions. Let's take the clinical utility one first. There's nothing directly that can be inferred from the PATHFINDER 2 study to the stage shift or the reduction in late-stage detection. That is the primary endpoint of the NHS Galleri, but ***there are many aspects of PATHFINDER 2 that give us more confidence in the overall performance of Galleri. And those specifically are the dramatically increased cancer detection rate when added to standard of care screening, and secondly, the much higher PPV that we've been observing as well as the episode sensitivity, which is quite high.***
>
> For those of you who may not have been following this, when case-controlled studies report high sensitivity, they very rarely translate into that level of performance in actual interventional studies, and we've seen that even in the MCED field with the one interventional study that was done in 65-year-old women, where the performance of the assay from the case-control study simply did not come close to replicating. So we're very pleased with that

43

Verified Shareholder Derivative Complaint

episode sensitivity, those numbers coming out of PATHFINDER 2 relative to what we had seen in prior studies.

So I think those three things together, Doug, give us a lot of confidence in the performance, but they don't directly speak to stage shift or the reduction in late-stage cancer because that will much more be related to the case mix of cancers in that individual study and the stage distribution in that individual study.

I'll turn it over to Harpal in a minute to comment more on the NHSCU. But on the FDA, based on the 2023 panel, it became -- it was quite clear what the FDA said in respect to the meaningful necessity of having the CSO directed workup. And given what we've seen now with Galleri and PATHFINDER 2 with very high CSO accuracy and very rapid diagnostic resolution, we feel really confident about that finding.

The other thing the FDA emphasized was the false positives being one of the biggest harms related to screening. And with our 0.4% false positive rate, we feel very good about that. And the other thing they mentioned, of course, as it relates to safety, was the over-diagnosis. And we've published now multiple times that low shedding tumors that are indolent are not typically detected well by Galleri. So Galleri is very unlikely to contribute to the problem of overdiagnosis of indolent cancer. So on those three dimensions, we feel very good. And then I'll ask Harpal to comment more on the clinical utility question.

103.  Defendant Kumar expanded on Defendant Ofman's remarks, specifically discussing the primary endpoint of the NHS-Galleri study, stating, in relevant part:

Yes. I mean I think you've largely covered it, Josh. But you're right, Doug, that your primary endpoint in NHS Galleri will be looking at that reduction of late-stage cancers. And in order to find a reduction, you have to have a randomized controlled trial. And that's, of course, what an NHS Galleri is.

I think just to add one point to what Josh said, one of the things that encourages me greatly from PATHFINDER 2 is that more than half of the cancers were found at stages 1 and 2. And that's in a cohort of cancers where 3/4 are currently unscreened. And so *I think to the extent that you can take any guidance from a study that doesn't have a comparator arm, I think those points really do encourage me as well*.

44

Verified Shareholder Derivative Complaint

*November 12, 2025 Earnings Call*

104.   On November 12, 2025, the Company hosted an earnings call to address the third quarter FY 2025 results that Grail released earlier that day (the "3Q 2025 Earnings Call").

105.   During the 3Q 2025 Earnings Call, Defendant Ofman reminded investors of the high positive predictive value finding in Grail's previously released NHS-Galleri top-line results, stating, in relevant part:

> Our PMA submission will include these data from the first 25,000 enrolled in PATHFINDER 2 to complete 12 months of follow-up, plus findings from the prevalent round of screening from the NHS Galleri randomized clinical trial as well as the results of a bridging study between the version of Galleri used in the 2 registrational trials to the updated version that we plan to submit to the FDA for premarket approval.
>
> As a reminder, *we announced positive top line results from the prevalent round of screening in the NHS Galleri trial in May of this year, namely that data from the prevalent screening round showed a substantially higher positive predictive value than that was observed in the first PATHFINDER study.*

106.   During a question-and-answer segment of the 3Q 2025 Earnings Call, Defendant Kumar stated that the reduction of late-stage cancers could not be relied on as a preliminary metric, and detailed the purpose behind the NHS-Galleri trial, in pertinent part:

> <Q: Douglas Anthony Schenkel – Wolfe Research, LLC – MD, Senior Research Analyst and Head of Life Science & Diagnostic Tools> So I want to actually talk about NHS England a little bit more, and then I have a COGS-specific question. So starting on NHS England, looking back to May 2024, when the statement was issued saying that early results were not compelling enough to justify a large-scale pilot, were they referring to any clinical utility data from year 1 or to test level performance metrics such as PPV, sensitivity and/or specificity? Can you share a little bit more on what prompted that decision?
>
> And then on the same topic, has anyone besides GRAIL and the NHS evaluation team seen the year 1 NHS Galleri data. I'm just curious if anyone

Verified Shareholder Derivative Complaint

else has seen it? And then if not, at what venue do you anticipate releasing that data more broadly, keeping in mind that you've said the FDA module submission is expected to be, I think, completed in Q1. So it would seem like that data would need to be released soon.

*** 

<A: Defendant Kumar> Sure. Thank you, Doug. So on NHS England's decision last year, important to reiterate that what they would have wanted to see in order to initiate a pilot at that stage was very exceptional data. And they looked at a few specific metrics, of which PPV was definitely one. ***To remind everyone, it isn't possible to look at the sort of broad utility measure of Stage 3 and 4 reduction with only 1 year of data. That has to come with 3 years of data***. But PPV was certainly one. And you'll have seen our announcement earlier this year that the PPV in that first round was substantially greater than we saw in our first PATHFINDER study, which to remind everyone was 43%.

So ***it gives you a sense of some of the information that was seen at the time. But again, to reiterate what the NHS would have wanted to see was truly exceptional data in order to accelerate*** -- and the point is they were looking about an acceleration of an implementation rather than waiting until the final study results. And what they said at the time was, ***it wasn't exceptional enough to accelerate that implementation*** and so that they wanted to wait for the final study results.

In answer to your second question, no, ***only the NHS evaluation team have seen that data so far***.

To the third question, yes, it will be the data from the prevalent round only from the intervention arm will be part of our FDA PMA submission package in Q1 next year, but ***that does not mean it will be in the public domain at that point. There won't be any data in the public domain from NHS Galleri until we have the final study results.***

***November 13, 2025 Investor Day Call***

107.   On November 13, 2025, the Company conducted its annual Investor Day call, which included prepared remarks from Peter Sasieni, a member of Grail's Advisory Board, about the NHS-Galleri study design, including, in relevant part:

So the ***main endpoint is a reduction in advanced stage cancer. And this is a***

Verified Shareholder Derivative Complaint

*little bit controversial*, so I want to talk about it a little bit. And the first is that I think it's really important to think about causal reasoning. Much of my career, I worked on cervical cancer, HPV vaccination. So I want to talk about that for a minute. We now know that cervical cancer is caused by HPV infection.

If you have a persistent infection, it can start to lead to a precancerous lesion, cervical neoplasia. If that's not treated, it can go on and to become invasive cervical cancer. And if you had a cervical cancer and you didn't treat it or even if you did, you can get death from cervical cancer. If you can prevent the infection, you'll be able to prevent the death of cervical cancer.

No one said that you had to wait and show a reduction in mortality from cervical cancer in order to introduce HPV vaccination. And in fact, it was only 17 -- no, slightly less, about 15 years after we introduced HPV vaccination that we were able to show a reduction in cervical cancer as a result of that vaccination. Similar arguments go for cancer screening. *Cancer progresses through stages. For most cancers, prognosis gets substantially worse for the more advanced stages. If you find a cancer earlier, screening will lead to fewer advanced stage cancers* than the -- because the advanced stage cancers have substantially worse prognosis, you're going to likely to reduce cancer-specific mortality.

*** 

So how are we doing this? So first of all, we're going to test for a reduction in Stage II and Stage IV cancers from these 12 prespecified cancers that account for 2/3 of cancer mortality in the U.S. and the U.K. If that's significant, the result is significant. The trial has shown that it can reduce advanced stage cancers from these 12 types. But if it is, we want to look further, does it have an effect on other types than the -- other than 12 types or does it have an effect overall.

108. The statements referenced above in ¶¶94-107 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the trial period, which was three years, and thus the screening duration, was insufficient to demonstrate whether the primary endpoint was achievable; (2) as a result, the Company's NHS-Galleri trial failed to achieve the primary endpoint of a statistically

Verified Shareholder Derivative Complaint

significant reduced in Stage III and IV cancers; and (3) the Company overstated the expected results from the NHS-Galleri trial. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## THE TRUTH EMERGES

### February 19, 2026 Press Release

109.   The truth emerged when, on February 19, 2026, the Company issued the February 2026 Press Release, titled "Landmark NHS-Galleri Trial Demonstrates a Substantial Reduction in Stage IV Cancer Diagnoses, Increased Stage I and II Detection of Deadly Cancers, and Four-Fold Higher Cancer Detection Rate." Despite the positive headline for the February 2026 Press Release, the February 2026 Press Release announced that the NHS-Galleri trial nevertheless failed to achieve its primary endpoint. The February 2026 Press Release stated, in relevant part:

> ***The primary endpoint of statistically significant Stage III-IV reduction was not observed.*** However, there was a favorable trend toward fewer Stage III-IV cancers in a pre-specified group of 12 deadly cancers\* in the intervention arm after the prevalent screening round.

110.   While the NHS-Galleri trial's "primary objective" was to "show a reduction in late-stage (III-IV) cancers in people who received the Galleri test compared to those who did not," the February 2026 Press Release failed to quote anyone mentioning this primary endpoint miss.

### February 19, 2026 Earnings Release

111.   That same day, the Company issued a press release titled "GRAIL Reports Fourth Quarter and Full Year 2025 Financial Results" (the "FY 2025 Earnings Release"), which briefly mentioned that the NHS-Galleri trial failed to achieve the primary endpoint of statistically significant late-stage cancer reduction, reporting, in relevant part:

> Announced topline results from the landmark, randomized, controlled NHS-Galleri trial, which evaluated annual screening with the Galleri® test in

Verified Shareholder Derivative Complaint

England's National Health Service (NHS) over three years in 142,000 demographically representative participants aged 50 to 77. The results show that adding Galleri to standard of care screening resulted in a substantial reduction in Stage IV cancer diagnoses, increased Stage I and II detection of deadly cancers, and four-fold higher cancer detection rate when compared to standard of care alone. ***While there was a trend towards reduction in combined Stage III and IV, the trial did not meet the primary endpoint of a statistically significant reduction.***

***February 19, 2026 Earnings Call***

112.   Later that same day, the Company hosted the FY 2025 Earnings Call to discuss both the February 2026 Press Release and the FY 2025 Earnings Release.

113.   During the FY 2025 Earnings Call, Defendant Ragusa addressed the disappointing primary endpoint miss, stating, in relevant part:

We issued a press release this afternoon with top line results from our NHS-Galleri trial. We observed a substantial reduction in Stage IV cancer diagnosis, increased Stage I and II detection of deadly cancers and a fourfold higher cancer detection rate, outcomes that matter for patient care.

While there was a trend towards reduction in combined Stage III and IV, ***the trial did not meet the primary endpoint of statistically significant reduction***. These data show the benefit of multi-cancer screening with Galleri and provide the strongest evidence for the recommended annual screening interval. Harpal will talk through the top line NHS-Galleri trial results shortly.

114.   Further, on the FY 2025 Earnings Call, Defendant Kumar expanded on Defendant Ragusa's summary of the top-line results reveal, stating, in relevant part:

Detailed results from the NHS-Galleri trial will be submitted for presentation at the upcoming ASCO meeting in Chicago in late May. ***The design of the NHS-Galleri trial was informed by a large body of evidence showing that across multiple cancer types, reductions in late-stage disease are strongly associated with reductions in cancer mortality***. While ***we did not observe a statistically significant reduction in combined Stage III and IV cancers through the trial, which was the primary endpoint of the study***, there was a favorable trend after the prevalent screening round, and we saw compelling evidence of Galleri's benefit.

Verified Shareholder Derivative Complaint

Comparing the two arms of the study, Stage IV diagnoses in the prespecified group of 12 deadly cancers decreased with each year of sequential Galleri screening, with a greater than 20% reduction in the second and third rounds. Similar reductions were observed across all cancers. The reduction in Stage IV cancer diagnoses is a critically important outcome, which we believe can lead to more effective intervention for patients, particularly given the substantial and growing arsenal of effective treatments for many Stage III cancers. In fact, there is a dramatic improvement in survival for many types of cancer at Stage III as compared with Stage IV.

These results are the first time a multi-cancer early detection test has demonstrated population scale stage shift and reduction in metastatic disease in a randomized trial. Screening with Galleri increased the overall cancer detection rate fourfold compared to standard of care and identified substantially more Stage I and II cancers in types that are typically detected at late stage.

Screening with the Galleri test also resulted in a substantial reduction in the number of cancers detected clinically through emergency presentation, which are associated with significantly higher mortality and health care costs. And these benefits came with a strong safety profile. No serious safety concerns were reported in any of the approximately 70,000 participants who received the Galleri test across 3 rounds of testing.

115.   Later, during the question-and-answer portion of the FY 2025 Earnings Call, Defendants Ragusa and Ofman responded to an analyst's question regarding FDA approval and regulatory hurdles, in pertinent part:

<Q: Douglas Anthony Schenkel – Wolfe Research, LLC – MD, Senior Research Analyst and Head of Life Science & Diagnostic Tools> I'll try to get them all out there upfront and then listen. So first, really a follow-up to the very first question, and I think it's the most important question tonight given the stock reaction in the aftermarket. So I want us to be airtight on this. Is the probability of FDA approval unchanged as a result of the NHS-Galleri readout? Because if the answer is, the probability is unchanged, it would mean the value associated with FDA approval and by extension, CMS reimbursement is also unchanged. So that's the first question. Yes or no, has the probability not changed?

The second question is on NHS coverage in the U.K. I know, again, you just

Verified Shareholder Derivative Complaint

got a question on this, but I'm curious if there are any examples you can point to where a diagnostic has been reimbursed after missing a primary endpoint. And then my third question is, has your analysis of NHS-Galleri results led you to any explanation regarding why you came up short of the primary endpoint? Are there potential design issues or population SKUs, anything like that?

<A: Defendant Ragusa> Yes. Thanks, Doug. Maybe, Josh, I'll hand over to the FDA questions to you.

<A: Defendant Ofman> Yes. Thanks for the question, Doug. Everything we've learned from the FDA, their history with us, our conversations has been, their focus is going to be on clinical performance and safety. And the data set that we are -- that we have submitted includes the full PATHFINDER 2 study of the first 25,000 participants and the first year, which is the performance period of the NHS Galleri trial.

*In their advisory board meetings and their public comments, they have been quite clear that their focus is on clinical validation and not clinical utility*. And what we've tried to demonstrate in the NHS trial is a population level effect well beyond clinical validation and clinical performance. And we were able to demonstrate a really important finding of a substantial reduction in Stage IV cancers and a fourfold improvement in the cancer detection rate. But those are things that are not part of our submission right now to the FDA. And based on their own comments, they're going to be focused on clinical validation.

116. Further, Defendant Kumar elaborated on the NHS-Galleri trial top-line results, stating, in relevant part:

So I think -- Doug, I think your second question was around endpoints on diagnostic studies. I think it's just worth pointing out that it's extremely rare for any diagnostic to go through a randomized controlled trial. It's very common for drugs to go through randomized controlled trials, but you actually very rarely see a diagnostic test evaluated in as rigorous a way as we have done through the NHS-Galleri trial. I just think it's really important to make that point.

Not only have we rigorously assessed it through an RCT, but it's enormously large trial, 142,000 people. So we have a data set the likes of which I am not aware any other diagnostic has been through other than sort of really

51

Verified Shareholder Derivative Complaint

significant interventional diagnostic type products. So I think that's the first thing to say.

The second thing to say is this is an enormously rich data set, and it has a large number of components to it, and we've shared those with you today. *It's absolutely right to say we didn't hit the primary endpoint.* But what we did see was a very compelling clinical benefit here. And I think that story stands in terms of generating excitement out there in the clinical community around what's possible with a test like this. Being able to reduce Stage IV cancers gives clinicians the opportunity to use curative treatments that they otherwise wouldn't have the opportunity to use. So I think that's really very compelling.

And then your third question, I think, was about what are we learning looking at the data. And just a couple of comments on that. First of all, it's -- we've not had this data for very long. We're looking into it. *There's a lot of data to work through. One of the things we've seen is that -- and if I break apart the primary endpoint, it's a combined Stage III and IV reduction. And so when you break that apart, we did see a Stage IV reduction. But as we've commented on, we saw an increase in Stage II cancers.*

And one of the things that looks to be the case when we look at the data is that we expect to see a stronger effect if we were to continue to follow up this cohort for a longer period of time. And that's why we're saying we want to extend the follow-up for a further 6 to 12 months, and that's why we'll be doing that. So that's one of the things that we've seen when we're looking at the data, but there's a lot more to learn.

117. Additionally, during the FY 2025 Earnings Call, Defendant Kumar noted that the NHS-Galleri trial period would likely need to be extended to reach its primary endpoint, in pertinent part:

<Q: Catherine Walden Ramsey Schulte – Robert W. Baird & Co. Inc. – Senior Research Analyst> I guess, first, just on that last point of extending the trial follow-up by 6 to 12 months. Is that something that you and NHS have already agreed on? And I guess, what is the goal of what you will see in that 6 to 12 months? Is it to push more on the Stage III reduction? Or is there something else that NHS is hoping to see?

\*\*\*

<A: Defendant Kumar> Yes. Thanks, Catherine. We haven't discussed it in

Verified Shareholder Derivative Complaint

any detail with the NHS yet, but I think it's -- I really can't see any obstacles in being able to do that. What it requires is not going back to participants or clinicians. It would be a continuation of passive data collection, which is already being recorded. And so it's just about the passage of time and agreeing with the NHS team that we can get access to that data. I think that will -- I don't foresee any significant obstacles in that regard.

And in answer to your second question, yes, what we want to see is particularly the control arm data maturing more than we've been able to see. And perhaps if I just elaborate a little bit on that, what you tend to see in a screening trial -- in any screening trial is that you're finding cancers that would have been detected later. And so if you think about what that means in practice, you're pulling forward into your intervention arm cancers from the future.

*For a control arm of the study, those cancers may not yet have manifested. So when you're comparing 2 arms of the study, what you'd like to have is long enough follow-up that you can compare the 2 arms really, really well together.* And what *we've concluded looking at the data is we probably need a longer follow-up time to be able to do that adequately*.

118.    In response to another analyst's question regarding the length of the trial period, both Defendants Kumar and Ofman reiterated that the trial period likely needed to be longer to obtain better top-line results, revealing, in relevant part:

<Q: Daniel Gregory Brennan – TD Cowen – MD and Senior Tools & Diagnostics Analyst> And I mean if I can sneak in one final one. So the trial was set up for 3 years. Obviously, it was going to be a surrogate for mortality because mortality would just take too long. So I think that was pretty well established. Was there a decision when you set it up for 3 years as opposed to maybe setting it up with a longer follow-up period, kind of how that decision was made? Obviously, it sounds like now you're hoping, obviously, the longer follow-up will still prove out the study. But I'm just wondering when you went into it, how was that decision made?

<A: Defendant Kumar> Yes. I mean, look, as with any study, it's designed and sized and powered with the best information you have at the time. And at the time, we felt that 3 rounds of screening followed by a year of follow-up would be sufficient. *I think with the benefit of hindsight, we probably should have allowed for a longer follow-up period*.

53

Verified Shareholder Derivative Complaint

There have interestingly been a number of publications over the last couple of years about screening studies in general, not just about NHS-Galleri, which make this exact point that the trial should be followed up for longer than 12 months post the last appointment. *As I say, this trial was designed 6 years ago, and that was the best information we had at the time.* But as I've already touched on, on this call, we have the ability to continue follow-up. So that's what we're going to be doing.

<A: Defendant Ofman> And it's probably just worth noting that most screening trials have gone on for decades, at least 1 decade, if not 2. And so this was a very – in the context of screening trials, *this was actually a very short trial with a very ambitious endpoint*. And that's part of the story here. But it is the first time that an MCED test has shown the ability to shift the stage diagnosis for the population in a randomized clinical trial. And I don't think we should let that kind of go by.

119. On this news, the price of the Company's stock fell $51.32 per share, or approximately 50.6%, from a close of $101.53 per share on February 19, 2026, to close at $50.21 per share on February 20, 2026.

### DAMAGES TO GRAIL

120. As a direct and proximate result of the Individual Defendants' conduct, Grail has lost and will continue to lose and expend many millions of dollars.

121. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

122. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

123. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any

54

Verified Shareholder Derivative Complaint

investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

124. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

125. As a direct and proximate result of the Individual Defendants' conduct, Grail has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

126. Plaintiff brings this action derivatively and for the benefit of Grail to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Grail, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

127. Grail is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

128. Plaintiff is, and has been at all relevant times, a shareholder of Grail. Plaintiff will adequately and fairly represent the interests of Grail in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

129. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

130. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Grail's Board consisted of the following five individuals: Defendants Ofman, Chase, Krevans, Mizell, and Summe (the "Director-Defendants"). Plaintiff needs

55

Verified Shareholder Derivative Complaint

only to allege demand futility as to three of the five Director-Defendants that were on the Board at the time this action was filed.

131. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

132. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Grail to issue materially false and misleading statements. Specifically, the Director-Defendants caused Grail to issue false and misleading statements which were intended to make Grail appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

133. Additional reasons that demand on Defendant Ofman is futile follow. Defendant Ofman has served as a Company director since March 2026, and as Grail's CEO since June 1, 2026. Additionally, during the Relevant Period, Defendant Ofman served as the President of Grail from June 2021 to March 2026. The Company provides Defendant Ofman with his principal occupation, for which he receives lucrative compensation. Thus, as the Company admits, Defendant Ofman is not an independent director. As the Company's highest officer and a trusted Company director, Defendant Ofman conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading

Verified Shareholder Derivative Complaint

statements alleged herein and personally made many of the false and misleading statements alleged herein. Furthermore, Defendant Ofman's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein further demonstrate his motive in facilitating and participating in the scheme. Moreover, Defendant Ofman is a defendant in the Securities Class Action. For these reasons, Defendant Ofman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134. Additional reasons that demand on Defendant Chase is futile follow. Defendant Chase has served as a Company director since June 2024. Further, Defendant Chase is the Chairperson of the Audit Committee, and a member of the Compensation Committee and the Nominating and Corporate Governance Committee. The Company provides Defendant Chase with handsome compensation for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Chase solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself as a Class I Director, allowing him to continue to breach his fiduciary duties to the Company. For these reasons, Defendant Chase, too, breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135. Additional reasons that demand on Defendant Krevans is futile follow. Defendant Krevans has served as a Company director since October 2024. Further, Defendant Krevans is a member of the Compensation Committee, the Audit Committee, and the Nominating and Corporate Governance Committee. The Company provides Defendant Krevans with handsome compensation for her role as a director. As a trusted

director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Krevans solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendant Chase as a Class I Director, allowing him to continue to breach his fiduciary duties to the Company. For these reasons, Defendant Krevans, too, breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

136. Additional reasons that demand on Defendant Mizell is futile follow. Defendant Mizell has served as a Company director since June 2024. Further, Defendant Mizell is the Chairperson of the Compensation Committee and a member of the Nominating and Corporate Governance Committee and the Audit Committee. The Company provides Defendant Mizell with handsome compensation for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Mizell solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendant Chase as a Class I Director, allowing him to continue to breach his fiduciary duties to the Company. For these reasons, Defendant Mizell, too, breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137. Additional reasons that demand on Defendant Summe is futile follow. Defendant Summe has served as a Company director since June 2024. Further, Defendant Summe is the Chair of the Board and is the Chairperson of the Nominating and Corporate Governance Committee and a member of the Compensation Committee and the Audit

Verified Shareholder Derivative Complaint

Committee. The Company provides Defendant Summe with handsome compensation for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Summe solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendant Chase as a Class I Director, allowing him to continue to breach his fiduciary duties to the Company. For these reasons, Defendant Summe, too, breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.   Additional reasons that demand on the Board is futile follow.

139.   Defendants Chase (as chair), Summe, Krevans, and Mizell served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

140.   In violation of the Code of Ethics, the Director-Defendants conducted little, if

Verified Shareholder Derivative Complaint

any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

141. Grail has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Grail any part of the damages Grail suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

142. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

143. The acts complained of herein constitute violations of fiduciary duties owed by Grail's officers and directors, and these acts are incapable of ratification.

144. The Director-Defendants may also be protected against personal liability for

Verified Shareholder Derivative Complaint

their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Grail. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Grail, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

145. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Grail to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

146. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against Defendants Ragusa, Chase, Krevans, Mizell, and Summe for Violations of Section 14(a) of the Exchange Act**

147. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

148. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of

interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

149.　Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

150.　Defendants Ragusa, Summe, Krevans, Mizell, and Chase caused the 2025 Proxy Statement to be false and/or misleading by failing to disclose, *inter alia*, that: (1) the trial period, which was three years, and thus the screening duration, was insufficient to demonstrate whether the primary endpoint was achievable; (2) as a result, the Company's NHS-Galleri trial failed to achieve the primary endpoint of a statistically significant reduced in Stage III and IV cancers; (3) the Company overstated the expected results from the NHS-Galleri trial; and (4) as a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

151.　The 2025 Proxy Statement also failed to disclose, inter alia, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

152.　Defendants Ragusa, Summe, Krevans, Mizell, and Chase knew or recklessly

Verified Shareholder Derivative Complaint

disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff voting on the matters set forth for shareholder determination in the 2025 Proxy Statement at the 2025 Annual Meeting on May 29, 2025, including but not limited to, the re-election of Defendant Chase as a Class I Director.

153. As a result of Defendants Ragusa, Summe, Krevans, Mizell, and Chase causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendant Chase as a Class I Director, thereby allowing him to continue breaching his fiduciary duties to the Company.

154. The Company was damaged as a result of Defendants Ragusa, Summe, Krevans, Mizell, and Chase's material misrepresentations and omissions in the 2025 Proxy Statement.

155. Plaintiff, on behalf of Grail, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

156. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Grail's business and affairs.

158. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

159. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Grail.

160. Also in breach of their fiduciary duties owed to Grail, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the trial period, which was three years, and thus the screening duration, was insufficient to demonstrate whether the primary endpoint was achievable; (2) as a result, the Company's NHS-Galleri trial failed to achieve the primary endpoint of a statistically significant reduced in Stage III and IV cancers; and (3) the Company overstated the expected results from the NHS-Galleri trial. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

161. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

162. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

163. In yet further breach of their fiduciary duties, two of the Individual Defendants engaged in lucrative insider sales of Company common stock, netting combined proceeds of over $7.4 million.

164. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Grail's securities.

Verified Shareholder Derivative Complaint

165. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Grail's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

166. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

167. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Grail has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

168. Plaintiff, on behalf of Grail, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Unjust Enrichment**

169. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Grail.

171. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Grail that was

tied to the performance or artificially inflated valuation of Grail, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

172. Plaintiff, as a shareholder and a representative of Grail, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

173. Plaintiff, on behalf of Grail, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

174. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Grail, for which they are legally responsible.

176. As a direct and proximate result of the Individual Defendants' abuse of control, Grail has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

177. Plaintiff, on behalf of Grail, has no adequate remedy at law.

### FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

178. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary

duties with regard to prudently managing the assets and business of Grail in a manner consistent with the operations of a publicly held corporation.

180. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Grail has sustained and will continue to sustain significant damages.

181. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

182. Plaintiff, on behalf of Grail, has no adequate remedy at law.

## SIXTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

183. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

185. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Grail to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

186. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

187. Plaintiff, on behalf of Grail, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Ragusa, Ofman, and Kumar for Contribution Under Sections 10(b) and 21D of the Exchange Act

188. Plaintiff incorporates by reference and re-alleges each and every allegation set

67

Verified Shareholder Derivative Complaint

forth above, as though fully set forth herein.

189.   Grail and Defendants Ragusa, Ofman, and Kumar are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Ragusa, Ofman, and Kumar's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

190.   Defendants Ragusa, Ofman, and Kumar, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

191.   Accordingly, Defendants Ragusa, Ofman, and Kumar are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

192.   As such, Grail is entitled to receive all appropriate contribution or indemnification from Defendants Ragusa, Ofman, and Kumar.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Grail, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Grail;

(c)   Determining and awarding to Grail the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and

68

Verified Shareholder Derivative Complaint

severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Grail and the Individual Defendants to take all necessary actions to reform and improve Grail's corporate governance and internal procedures to comply with applicable laws and to protect Grail and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Grail to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Grail restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 23, 2026                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/Robert C. Moest*_____
Robert C. Moest, Of Counsel, SBN 62166

Verified Shareholder Derivative Complaint

2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: rmoest@gmail.com

*Attorney for Plaintiff*

Verified Shareholder Derivative Complaint

**VERIFICATION**

I, Kristen Augitto, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19 day of June 2026.

DocuSigned by:

AEF17652C4214D6...

Kristen Augitto